IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TERRANCE J. SHAW,

                          Plaintiff,                          OPINION & ORDER

          v.
                                                              12-cv-497-wmc
EDWARD WALL *et al.*,

                          Defendants.

          In this civil action, plaintiff Terrance J. Shaw brings claims against various staff members at the Oshkosh Correctional Institution ("OSCI"), alleging violation of his First and Fourteenth Amendment rights, as well as disability discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*  Shaw has moved for partial summary judgment on his claims that: (1) defendants Matthew Jones and Debby Loker violated his First Amendment rights by refusing his request to donate to a political party; and (2) defendants Jones and Edward Wall violated the Rehabilitation Act by requiring Shaw to attend canteen after able-bodied inmates, when necessities were frequently sold out.   (Dkt. #31.) Defendants have, in turn, moved for summary judgment on all but one of Shaw's claims.[1] (Dkt. #42.)  The court grants defendants' motion with respect to Shaw's First Amendment retaliation and freedom of speech claims, and denies Shaw's motion with respect to the latter.  However, it will deny both parties' motions for summary judgment with respect to the Rehabilitation Act claim, because factual disputes preclude resolving that claim at this time.

---

[1] Shaw's Equal Protection claim was reinstated in this case after defendants had already filed a motion for summary judgment.  To avoid prejudice, defendants were granted leave to file a second motion on that claim by August 23, 2014.  (*See* May 23, 2014 Opinion & Order (dkt. #55) 6 n.4.) The court will address that motion in a separate opinion.

UNDISPUTED FACTS

## I.  Background

Plaintiff Terrence Shaw is a State of Wisconsin Department of Corrections ("DOC") inmate currently incarcerated at OSCI, where he has been since April 23, 2004.  Defendants concede for purposes of summary judgment that Shaw has a number of disabilities that limit his life activities, including his ability to work.  Specifically, on October 6, 2011, Shaw was diagnosed with a mild inferior wall ischemia, a condition in which the heart's oxygen supply is decreased due to deficient blood flow to the heart muscle.[2]  On November 29, 2011, arthritis was added to Shaw's "problem list," and by September 13, 2012, Shaw's range of motion in his hands was at 50% for his left hand and 30% for his right.[3]  A psychiatric report dated January 2, 2014, indicates that Shaw also has a history of chronic post-traumatic stress disorder.

Defendants are all DOC employees at OSCI in various capacities.  Defendant Matthew Jones is a Corrections Unit Supervisor (Unit Manager) at OSCI and worked as Unit Manager of OSCI's "W Building" from approximately July of 2010 until July of 2011. Defendant Jimmy Messing is a Social Worker – Senior at OSCI and has been employed there since May 15, 1994.  Defendant Debby Loker was a Corrections Unit Supervisor (Unit Manager) from November 7, 2010, until her retirement on March 1, 2013.  Before that, she was OSCI's Human Resource Director.

W Building houses inmates in the general population, as well as those serving disciplinary sanctions.  Shaw, along with about 163 other inmates, is housed in W

---

[2] As of November 14, 2007, however, Shaw's test results indicated that his heart was receiving sufficient blood flow.
[3] Again, in October of 2007, there was no indication that Shaw's ability to grasp items was in any way affected by degenerative chances in his hands.

Building's general population.  W Building has "wet cells," meaning that inmates have personal toilets in their cells.  Toilet paper is made available as needed on the unit at no cost to inmates; the same is true of soap, toothbrushes and toothpaste, although some inmates prefer to purchase particular brands from OSCI's canteen.

## II. Canteen Access

### A. General Canteen Procedures

OSCI maintains a canteen accessible to inmates, which facilitates the purchase of approved property.  In W Building, the canteen is available to the general population on alternating Thursdays.  Items for canteen arrive from a warehouse every morning and at noon.  It is open during normal business hours, starting after the morning truck is unloaded at 8:30 a.m., except for a lunch break around noon to restock the supply for the afternoon. Inmates are allowed to spend a maximum of $75.00 every two weeks in the canteen.

The canteen usually offers more than one brand or variety of a particular item, especially if the item is popular.  While the items featured are periodically updated to reflect changes in vendor supply and inmate requests, there have always been at least a few varieties offered for those items that are popular or considered essentials.  For example, the canteen currently offers five different varieties of toothpaste, six different varieties of soap, two varieties of laundry soap and two types of cough drops -- regular Hall's brand and cherry-flavored, generic cough drops.[4]  In contrast, nasal spray, a less popular item, is available in just one brand, but is usually in stock when an inmate requests it, because it is less popular and inmates may only purchase one at a time.

---

[4] Between September 12, 2010, and April 3, 2011, the canteen price list indicates the same cough drops, soaps and laundry soap varieties were available, as well as four different varieties of toothpaste.

3

While items in the canteen rarely run out, there is a chance that a particular item may run low or out of stock. Defendants contend that should an item be out of stock, there is almost always another brand, flavor or variety of the same item type available; Shaw avers that on certain occasions when he attended canteen, there were no cough drops, laundry soap, nasal spray, antibacterial bar soap or floss picks available. When an item is out of stock, a note is posted on the canteen door so inmates may change their order form. Inmates may also change their order form at the register if an item they originally requested is out of stock.

Generally, to visit the canteen, inmates must sign up on sheets posted at the officer's station on the Wednesday afternoon before a canteen day. On the appointed day, canteen staff members notify the eligible unit to send approximately ten to twelve inmates. When they arrive, eight inmates are allowed in the canteen at any given time, while the rest wait in the hallway outside until it is their turn. As the line lessens, canteen staff call the unit to send another group. The number of groups called depends on how many inmates sign up for canteen on a given day. Typically, approximately ten to fifteen groups from W Building attend canteen during normal business hours. Regardless, the process continues until all inmates who have signed up have been able to go to canteen.

Usually, inmates with jobs or school obligations visit the canteen in the first group of the day, since their schedules require them to be at certain places at certain times. In contrast, inmates who do not work usually are allowed to attend the canteen in later groups, since they have more open schedules and thus more flexibility.

### B. Shaw's Work Classification

When first entering a DOC institution, an inmate receives a medical evaluation to determine what restrictions or special needs he may have.  A registered nurse reviews this medical classification information and notes it for a provider's review as part of the intake process.  Pursuant to this procedure, Shaw has been classified since August 24, 1988, as having a "Light Activity" physical activity level, meaning that he is restricted from work assignments requiring steadily-paced activity and may only work jobs in which he is permitted to work at his own pace.[5]  Under this classification, Shaw is technically cleared to hold numerous job placements, including librarian, tutor, worm food collector, knitting, window washer, laundry folder, unit duster, vermiculture, sweeper, light gardening, food preparation, food server and clerical work.

Despite his "Light Activity" classification, Shaw does not have a job and is on "unassigned" status.  Shaw maintains that his disabilities have rendered him unable to work and resulted in his "unassigned" classification, while defendants argue that Shaw is "unassigned" because he has not asked to work.  Indeed, it is undisputed that Shaw has made no inquiries or requests to seek out employment at OSCI.  On this basis, defendants contend that Shaw's decision not to work is voluntary, while Shaw avers that he is willing to accept any job assignment consistent with his disabilities but has not been offered such a job.

---

[5] Other activity level classifications include "Any Activity," which means the inmate is fit to perform any type of work or recreation; "Moderate Activity," which means the inmate is restricted from work involving lifting over 50 pounds and tasks demanding prolonged physical exertion; and "No Work Status," which means the inmate is unable to work.  Shaw has never been classified as "No Work Status."

### C. Shaw's Use of the Canteen

Because of his "unassigned" status, Shaw is not among those allowed in the canteen in the first group.  Although the record does not make clear when his group attends in the context of all ten to fifteen W Building groups who attend canteen, Shaw avers that he attends canteen with the last "unassigned" group of inmates.  Defendants maintain that even if he is in the last "unassigned" group of inmates, Shaw attends canteen in the first half of the W Building groups overall, and that at least half of the W Building inmates who attend canteen go after Shaw's group.[6]

From June 10, 2010, through May 26, 2011, Shaw spent a total of $1,994.75 in the canteen.  During that period, he purchased laundry soap (on four separate occasions); sixteen body soap products (on ten separate occasions); toilet paper; toothpaste; nasal spray (on two separate occasions); and cough drops.

### D. Complaints and Communication with Disability Rights of Wisconsin

Before December of 2010, Shaw repeatedly complained to defendant Jones that he was suffering disability-based discrimination, because he could not attend canteen until after inmates who work.  Jones told Shaw in response that his canteen attendance time had nothing to do with his disabilities and that he was not suffering discrimination.[7]

On December 13, 2010, defendant Jones received a letter from Attorney Michele Hughes of Disability Rights of Wisconsin.  In the letter, Hughes explained that she was writing on Shaw's behalf, based on an understanding that he is required to attend canteen

---

[6] Shaw purports to dispute these facts, but again relies solely on his affidavit, which states that he attends in the "last 'Unassigned' group."  (Terrance J. Shaw Aff. (dkt. #65) ¶ 2.)

[7] Jones further avers that he never told Shaw to "stop complaining."  Though Shaw purports to dispute this fact, he has not submitted any evidence that Jones ever made such a statement.  (*See* Defs.' Reply DPFOF (dkt. #71) ¶ 76.)

last because of his disabilities.   Hughes explained that Shaw is a qualified individual protected by the ADA, based on statements that he would like to work but is unable due to his disability.   Hughes further explained that the ADA prohibits prison officials from discriminating against a qualified individual with a disability, meaning Shaw's denial of meaningful access to canteen services violated the ADA and the rehabilitation Act.   Jones did not respond to the letter.   Instead, he forwarded it to the OSCI ADA coordinator.

On May 27, 2011, Shaw filed Offender Complaint OSCI-2011-10477, alleging that a "two-tier" canteen system violated his right to equal protection and constituted disability discrimination.   The complaint was eventually dismissed after Shaw exhausted it through the appeal process.

### III. Political Donation

On or about April 12, 2011, Jones received a disbursement request from Shaw, in which he asked to donate $10 to the Democratic National Committee ("DNC").   With the exception of this request, Jones never received a disbursement request seeking to donate money to a political party or candidate.   Jones denied this request on April 18, 2011.   He avers that the denial was based on his belief that a donation to a political campaign was impermissible as an "effort to influence the outcome of an election that Shaw was not permitted to vote in directly."   (Defs.' Reply DPFOF (dkt. #71) ¶ 81.)

Pursuant to the Inmate Handbook, when a disbursement request is not approved, the inmate may appeal through the complaint system.   Accordingly, on April 18, 2011, Shaw submitted Offender Complaint OSCI-2011-7629.   Inmate Complaint Examiner ("ICE") Timothy Pierce recommended dismissal of the complaint, stating that based on the

handbook, the acceptance of the disbursement request was at the discretion of the center director, and the ICE was not in a position to second-guess that determination.   The reviewing authority dismissed the complaint on May 2, 2011.

When Shaw appealed this dismissal, CCE Welcome Rose essentially reversed Pierce's decision.[8]   Her decision explained that under Wis. Adm. Code § DOC 309.48(6), all decisions on disbursement requests needed to be in writing and based on reasons "consistent with s. DOC 309.45."  (*See* Compl. Ex. 7 (dkt. #1-8) 8.)  She further explained that Jones's denial "does not indicate whether or not the aforementioned provisions under the department's administrative rules had been considered."  (*Id.* at 9.)   Finally, Rose indicated that Shaw's request could not be denied under a "blanket rule" and recommended Shaw be permitted to re-submit his request for proper consideration under § DOC 309.45. (*Id.*)

Jones received a copy of Rose's decision.   Shaw re-submitted his disbursement request on October 18, 2011.  On November 9, 2011, Jones denied the request for a second time, explaining that inmates are statutorily banned from voting and that donations to a political party are viewed as an attempt to participate in a process from which they are prohibited.   Once again, Shaw submitted an Offender Complaint, numbered OSCI-2011-23876.  ICE Pierce again recommended dismissal of the complaint, because he believed that no violation of §§ DOC 309.45-309.52 had occurred.

After the warden dismissed the complaint, Shaw again appealed, and CCE Rose again returned his complaint, stating in part:

---

[8] Technically speaking, Rose is said to "affirm" Shaw's original complaint in rejecting Jones's denial.

8

> Accordingly, I recommend this appeal be affirmed, not to say that the denial of the request had been improper, but to acknowledge that the institution again failed to follow proper procedures in reviewing the inmate's request to donate the funds from his trust account to a political party.  The inmate may again submit his disbursement request for consideration.  The institution's review of the request and the resulting decision must comport with DOC 309.45, Wis. Admin. Code.

With the exception of Shaw's request, Jones has never received a disbursement request from an inmate requesting to donate money to a political party or candidate.  Jones avers that both denials in Shaw's case were based on his concern that allowing Shaw to make the donation would violate the prohibition on voting; not whether Shaw had filed complaints of discrimination.  Shaw disputes these facts, arguing that Jones's lack of basis for making that decision suggests that his discrimination claims played a role in his denials.

At some point, Jones apparently told Loker, who transferred to Unit Manager in November of 2010, that inmates are not permitted to donate to political parties.  Thus, when Shaw resubmitted his DOC-184 Disbursement Request, seeking to donate $10 to the DNC, Loker also denied that request on May 14, 2012.[9]  Loker's undisputed reason for doing so was her belief that policy prohibited such donations.  (*See* Defs.' Reply DPFOF (dkt. #71) ¶ 103.)  There is no evidence in the record that Loker ever read either of the appeal decisions, which found no support for denying an inmate's request to disburse funds to a political party.

After Loker denied the request, Shaw filed Offender Complaint OSCI-2012-10231, which was affirmed.  Loker received a copy of the Reviewer's Decision.  Shaw was instructed in Pierce's decision to re-submit another signed disbursement request to Loker, but Loker

---

[9] Shaw's request did not indicate that it was a "resubmission," but he avers to informing Loker verbally of his prior complaints against Jones's decision.

does not recall ever receiving another request.  The record does not reflect whether Shaw ever re-submitted his disbursement request.

**IV. Telephone Call**

Generally speaking, defendant Jim Messing has allowed, and continues to allow, inmates to make toll-free calls from his office phone, so long as they have an appropriate reason.  Messing is not *required* to permit such calls under any circumstances.  Usually, an "appropriate reason" involves an inmate's property or the repair thereof, although Messing has at least once permitted Shaw to make a toll free "1-800" call from his office phone in order to obtain contact information for attorneys.

Messing will *not* permit inmates to make phone calls to individual attorneys from his office phone, however, because there are policies in place at OSCI governing inmate-attorney phone calls.   Under OSCI Procedure No. 700.20, inmates may call specific attorneys with legal matters only with the permission of the offender records supervisor. Inmates must submit a request to the records office to obtain permission for an attorney call, and attorney calls are to be scheduled and made from the records office during normal institution business hours, except in the event of an emergency.  The Inmate Handbook also lays out this process in detail, informing inmates that they must use a DOC-1631 "Telephone Request Add/Delete" form to request a call with an attorney.  Inmates may also schedule an attorney phone call by submitting an Interview Request to the records office, or by asking their attorney to call the institution and schedule a phone call.  Shaw has access to the Inmate Handbook, and the parties agree that he was aware of the process for scheduling attorney phone calls.

10

During his incarceration, Shaw has had numerous discussions with Messing, although Messing does not remember any specifics of complaints regarding canteen policy and never contacted anyone on Shaw's behalf regarding those complaints. Additionally, as of February 23, 2011, Messing was unaware that Shaw had contacted a Disability Rights attorney, nor did he know of the letter Jones had received from Michele Hughes. There is no evidence in the record that Messing knew anything about Shaw's actual complaints with respect to his disability and canteen attendance. Shaw does aver more generally that he spoke to Messing "[o]n several occasions" and informed him of his intent to take legal action against W Building's correctional staff, but is unclear when those conversations took place.

On February 23, 2011, Shaw asked to make a phone call from Messing's office phone. At the time, attorney Michele Hughes of Disability Rights of Wisconsin was already corresponding with OSCI on Shaw's behalf and with Shaw himself regarding his claims of disability discrimination.[10]  Nevertheless, Shaw avers that he informed Messing the purpose of his call was to acquire referral information for a civil rights attorney, not to speak to Hughes or any other specific lawyer. Messing disputes this characterization, stating that he remembers Shaw asking to use his office phone to make a legal phone call to a specific female attorney. Messing also avers that he did not believe it was appropriate for Shaw to make a call to a specific attorney from his office phone, and that pursuant to his general

---

[10] Shaw claims that he never hired or retained Hughes to represent him, but he has placed into the record a letter from Hughes, dated March 22, 2011, in which she indicates she is continuing to work on his disability claim.  (*See* Compl. Ex. 3 (dkt. #1-3).)  Whether or not Shaw formally retained her as counsel, Hughes was undoubtedly working on his behalf during this period.

practice, he directed Shaw to submit his request to the records office pursuant to OSCI Procedure No. 700.20.

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the initial burden is met, for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Nor may the nonmoving party "merely rely on conclusory pleadings" to withstand the motion.  *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 361 (7th Cir. 1987).  Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'"  *Id.* at 323.

## I. Rehabilitation Act

### A. Summary Judgment

Both parties move for summary judgment on Shaw's claims against Wall and Jones under the Rehabilitation Act.  "To make out a prima facie case under the Act, the plaintiff must show: that he 'suffers from a disability as defined under the Act; that he was otherwise qualified for the [benefit, treatment or program]; that he was involved in programs receiving federal financial assistance; and that he was excluded from participation, denied benefits, or otherwise discriminated against solely because of his disability.'"  *Branham v. Snow*, 392 F.3d 896, 902 (7th Cir. 2004) (quoting *Silk v. City of Chi.*, 194 F.3d 788, 798 n.6 (7th Cir. 1999)).  "Refusing to make reasonable accommodations is tantamount to denying access" under the Rehabilitation Act.  *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012).  For the purposes of summary judgment, defendants have not disputed that Shaw suffers from disabilities as defined by the Act, including a heart condition and severe arthritis, and that the Department of Corrections receives federal financial assistance.  (*See* Defs.' Resp. PPFOF (dkt. #44) ¶¶ 4, 20.)  Accordingly, for purposes of summary judgment, the central questions are: (1) whether Shaw has been denied equal access to the canteen and (2) if so, whether the denial is "solely because of" his disabilities.

With respect to Shaw's motion, the court concludes that genuine disputes of material fact render summary judgment inappropriate.  Indeed, Shaw's brief in reply appears to concede as much.  (*See* Pl.'s Reply (dkt. #56) 2 (admitting that Rehabilitation Act claim "cannot be resolved on Summary Judgment").)  For instance, the parties dispute whether Shaw has ever been denied the benefits of canteen: defendants aver that the canteen essentially *never* runs out of products like cough drops, bar soap and toothpaste, while Shaw

13

avers that he has attended canteen only to find that those products are sold out.  Along with factual disputes as to whether Shaw's disability is a factor in his access to these items, this dispute alone precludes entering summary judgment for Shaw on the Rehabilitation Act claim.

Defendants also move for summary judgment on Shaw's Rehabilitation Act claim on multiple grounds, but again a wealth of factual disputes mires many of their arguments.  As noted above, there is a dispute as to whether the canteen ever runs out of products, and thus a dispute as to whether Shaw has even been denied a benefit of canteen because of his claimed disability.  Next, they argue that Shaw actually attends canteen in one of the *first* groups from W Building, citing to the affidavit of Shaw's current unit manager, Katherine Sabel.  (*See* Katherine Sabel Aff. (dkt. #51) ¶ 6.)  This, too, is in dispute: Shaw has maintained throughout this litigation that he attends canteen in the last "unassigned" group of inmates because of his disability, while all inmates with jobs or school commitments -- that is, all those who are "assigned" -- attend before he does.[11]

Since the Seventh Circuit has made clear that "summary judgment cannot be used to resolve swearing contests between litigants," the court is also unable to resolve these disputes as well.  *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).  Nor may the court "weigh the evidence or decide which testimony is more credible."  *Id.*  If a jury accepted Shaw's

---

[11] Defendants contend that Shaw conceded attending canteen in the third group of inmates out of 10 to 15 groups.  This appears to the court to mischaracterize Shaw's factual response, in which he acknowledges attending canteen in the third of three groups, which are: (1) W Building workers and students who attend canteen two days early, on Tuesday; (2) W Building workers and students who attend on Thursday; and (3) Unassigned inmates.  (*See* Pl.'s Reply PPFOF (dkt. #57) ¶ 5.)

version of events, rather than Sabel's, it could conclude that he was always sent in the last group of inmates and had, therefore, been denied the benefits of canteen.

Defendants also argue that even if Shaw *has* been denied canteen, the denial was based on his open schedule, not his disabilities.  Given that Shaw's theory of the case is that his disabilities are the sole cause of his open schedule, and that defendants' alleged refusal to give him a job he is capable of performing amounts to a refusal to accommodate those disabilities, this is at best a technical, factual argument for a jury to decide.  *Cf. Jaros*, 684 F.3d at 672 ("The refusal to accommodate Jaros's disability kept him from accessing meals and showers on the same basis as other inmates.").

In a closely-related argument, defendants contend that Shaw has voluntarily chosen not to work despite being qualified for a wide variety of jobs, including tutor, librarian, laundry folder, duster, sweeper, window washer and worm food collector.  Again, disputes of fact exist that render summary judgment inappropriate.  On this record, Shaw has certainly not sought employment actively while at OSCI.  But Shaw produced evidence that he is actually on *involuntary,* unassigned status, and that he has signed documents saying he is willing to accept any job offered, so long as it is consistent with his disabilities.  (*See* Terrance J. Shaw Aff. (dkt. #65) ¶ 5.)  Shaw has also provided an interview/information request slip, dated May 19, 2014, in which he inquired of the business office whether he was classified as "involuntary unassigned."[12]

Moreover, according to a copy of DAI Policy # 309.55.01 submitted by Shaw, "involuntary assigned" inmates are "eligible, available, and waiting for placement in

---

[12] The response states that Shaw has been "invu" since November 6, 1998.  (*See* Pl.'s Reply Ex. (dkt. #56-1) 2.)

approved work or program assignments where such work or program assignments exist, but are not currently available." (Terrance J. Shaw Aff. Ex. F (dkt. #65-1) 8.) This is enough to create a genuine dispute of fact as to whether: (1) Shaw has voluntarily decided not to work; or (2) defendants are unwilling or unable to offer him a job he can handle.

Next, defendants contend that they have adequately accommodated Shaw's disability by offering for free some of the necessities, like toilet paper, soap, toothbrushes and toothpaste, that Shaw alleges he has been unable to purchase. Shaw admits that these items are available, but he avers that they are of inferior quality to his preferred brands. Furthermore, it appears from the record that some items, like cough drops, nasal spray and floss picks, are *not* generally available for free on the unit, but, presumably, available only through canteen. While defendants are correct that the Rehabilitation Act does not require them to provide Shaw "with every accommodation he requests or the accommodation of his choice," *McElwee v. Cnty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012), there are apparently at least some items he cannot get elsewhere, such that he is being denied certain benefits of canteen participation. Shaw may ultimately have a difficult time recovering on this claim, which appears almost trivial, but that does not mean defendants are entitled to judgment as a matter of law.

Finally, defendants argue that relief is entirely unavailable, apparently based on the premise that Shaw attends canteen before most other inmates in W Building. As discussed above, that premise remains in dispute. Shaw could still, therefore, demonstrate his

entitlement to injunctive relief at a minimum, meaning that a lack of available relief is not an appropriate basis for summary judgment in this matter.[13]

## B. Preliminary Injunction

Shaw also asks the court to enter a preliminary injunction barring OSCI from enforcing its current policy and allowing him to attend canteen "with all the other able-bodied prisoners that are assigned to OSCI school programs or have a job." "A preliminary injunction is an extraordinary remedy that is only granted where there is a clear showing of need." *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). As a threshold matter, a plaintiff seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) irreparable harm; and (3) a lack of any adequate remedy at law. *Id.* Shaw has not met that burden here.

Shaw's likelihood of success on the merits is minimal. Given that most (though not all) of the products he alleges he cannot purchase are available for free -- including toothpaste, toilet paper, toothbrushes, laundry soap and dish soap -- he has also failed to persuasively demonstrate that he will be irreparably harmed should he not receive

---

[13] Defendants also argue that compensatory damages, which are theoretically available under the Rehabilitation Act, are unavailable here because Shaw cannot show intentional discrimination. "[A]ll circuits to consider the question have held that compensatory damages are only available for intentional discrimination, though there is a split over the appropriate standard for showing intentional discrimination." *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 n.4 (7th Cir. 2014). Defendants argue for the lower "deliberate indifference" standard, which requires (1) knowledge that a harm to a federally protected right is substantially likely, and (2) failure to act upon that likelihood. *S.H. ex rel. Durrell v. Lower Marion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013). The Seventh Circuit has not weighed in on the proper standard yet. *See CTL*, 743 F.3d at 528 n.4. At this stage, the court concludes that, crediting Shaw's version of events, a reasonable jury *might* find that defendants knew their system of requiring all inmates who did not work -- including without limitation those who have been denied the chance to work due to disability -- to attend canteen last was "substantially likely" to violate their federally protected rights. Thus, based on the standard defendants invoke and the need at summary judgment to resolve *all* factual disputes in Shaw's favor, the court will not wholly foreclose any possibility of compensatory damages at this time.

preliminary injunctive relief.  Thus, while Shaw's Rehabilitation Act claim survives summary judgment, he fails to provide sufficient proof to justify alteration of the status quo by entering a preliminary injunction.  Accordingly, his request will be denied.

## II. First Amendment Retaliation

To prevail on his claims of First Amendment retaliation, Shaw must prove that: (1) he engaged in an activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) there exists a causal connection between the two.  *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010). Specifically, with respect to causation, Shaw must show that his "First Amendment activity was 'at least a motivating factor'" in each defendant's decision to take retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).  If Shaw meets this standard, "the burden of persuasion will shift to the defendants to prove by a preponderance of the evidence that they would have taken the same action anyway." *Johnson v. Kingston*, 292 F. Supp. 2d 1146, 1157 (W.D. Wis. 2003).

### A. Jones

Shaw contends that Jones denied his request to make a $10 donation to the DNC in retaliation against him for complaining about OSCI's canteen policy, and later, for filing grievances premised on that policy.  Defendants do not dispute that filing grievances, as Shaw did in May of 2011, constitutes protected First Amendment activity.[14]  *See Hoskins v.*

---

[14] Less clear is whether Shaw's verbal complaints about the alleged discrimination in December of 2010 constitute protected activity under the First Amendment.  *See Bridges*, 557 F.3d 555 ("But it seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-

*Lenear*, 395 F.3d 372, 375 (7th Cir. 2005).  Nor do defendants argue that the denial of Shaw's disbursement request would be insufficient to "deter a person of ordinary firmness from exercising First Amendment activity in the future."  *Bridges*, 557 F.3d at 552 (quoting *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir. 1982) (internal quotation marks omitted)).  Instead, defendants focus their challenge entirely on causation, arguing that Shaw has produced no evidence from which a reasonable jury could conclude that his grievances were a motivating factor in the denial of his disbursement request.

Shaw relies on two pieces of evidence to support an inference of causation.  *First*, he points out that Jones has been employed at OSCI in a supervisory capacity for more than nine years, rendering Jones's erroneous reliance on the DOC Rules incredible.  *Second*, he argues that Rose made clear after the first denial that Jones's rationale was inappropriate, meaning that Jones had *no* legitimate reason for denying his second denial of his request to contribute, especially on the same grounds already rejected.

The problem with Shaw's argument is that *he* has the burden to "adduce sufficient evidence at trial to allow a jury to find that defendants were motivated by a desire to retaliate against him."  *Johnson*, 292 F. Supp. 2d at 1158.  Unfortunately for Shaw, he points to *no* evidence that would permit such a finding by a reasonable jury.  Instead, Shaw appears to argue that, because Jones did not articulate a permissible reason to deny Shaw's disbursement request, he must necessarily have been relying on an *impermissible* reason.  But this is mere speculation, just as one might speculate that Jones acted for an arbitrary or no

---

protected grievance.") (emphasis in original).  In their brief, however, defendants appear to assume that the verbal complaints in December of 2010 could constitute protected activity for First Amendment purposes.  (*See* Defs.' Br. Opp'n (dkt. #43) 15.)  The court expresses no opinion on this question, because in the end, it has no impact on its analysis.

reason.  Without more, speculation as to Jones's underlying motives is not enough to defeat summary judgment.  *See Turley v. Rednour*, 555 F. App'x 606, 609 (7th Cir. 2014) (citing *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008); *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003)).

A review of the record reveals no direct or circumstantial evidence to bolster Shaw's claim of retaliatory motive.  Frequently, plaintiffs in retaliation actions rely on suspicious timing to support their claims.  In this case, however, four months elapsed between Shaw's verbal complaints to Jones and the first disbursement denial, and six months elapsed between Shaw's grievance and the second disbursement denial.  This chronology does not amount to suspicious timing.  *See Benson v. Cady*, 761 F.2d 335, 342 (7th Cir. 1985) (five months between lawsuit and allegedly retaliatory transfer "greatly weaken[ed] any inference that the transfer was in retaliation for the lawsuit").  Even if it did, timing alone cannot sustain a retaliation claim.  *See Springer*, 518 F.3d at 485.  Similarly, there are no ambiguous statements evincing possible retaliatory motive in the record,[15] nor has Shaw offered any other circumstantial evidence of animus.  Indeed, Shaw can offer no examples of Jones *allowing* any other inmate to make a political contribution (while denying his request), or even any other inmate asking to do so.  Absent *any* evidence from which a rational factfinder could infer the requisite causal link between Shaw's complaints and the disbursement denial, Jones is entitled to summary judgment on Shaw's retaliation claim.

---

[15] Shaw alleges in his proposed findings of fact that Jones told him to "stop complaining" at one point, but he has offered no evidentiary support for this proposed fact.  He cites to Paragraph 6 of an unspecified affidavit, but none of Shaw's three affidavits includes this fact.  (*See* Terrance J. Shaw Aff. (dkt. #65); Supp. Terrance J. Shaw Aff. (dkt. #59); Terrance J. Shaw Aff. (dkt. #34).)  Nor has he presented evidence to place into dispute Jones's averment that he never told Shaw to "stop complaining."  (Defs.' Reply DPFOF (dkt. #71) ¶ 76.)  Even if he had, Shaw offers nothing permitting a jury to tie his animus to a request to donate to a political campaign.

### B. Loker

Shaw's retaliation claims against Loker, alleging that she denied his third political contribution request because he filed complaints against Jones, also cannot survive summary judgment.   While defendants' first argument -- that Loker did not know of Shaw's grievances against Jones and thus could not have retaliated against him -- fails because Shaw has averred that he personally informed Loker of his prior complaints against Jones, it is undisputed that Loker's decision to deny the disbursement request was based on her erroneous belief that DOC policy prohibited such donations, not on Shaw's protected activity.  (*See* Defs.' Reply DPFOF (dkt. #71) ¶ 103.)

Even disregarding Shaw's concession as to Loker's motives, Shaw again offers no evidence that the denial was retaliatory.   Shaw does not indicate *when* he supposedly told Loker of his complaints against Jones, meaning the court cannot determine whether the timing of Loker's denial of the disbursement request was suspicious in any way.   Nor does Shaw present other evidence of potential retaliatory animus.   Instead, Shaw merely speculates that Loker *may* have believed him to be a troublemaker and "whiner" based on his prior complaints.   As noted above, such speculation is insufficient to create a genuine dispute of fact as to causation in a retaliation case.  *Springer*, 518 F.3d at 484.   Accordingly, Loker is entitled to summary judgment as well.

### C. Messing

Finally, defendants have moved for summary judgment on Shaw's claim of retaliation against Messing, based on Messing's refusal to allow Shaw to make a toll-free phone call from his office phone.   They contend that Shaw's claim necessarily fails because the denial of a single telephone call is not an adverse action sufficient to deter an inmate of ordinary

firmness from exercising his constitutional rights.  *See Johnson*, 292 F. Supp. 2d at 1152.

Even viewing the circumstances in the light most favorable to Shaw, the court agrees.

Not only did Messing deny Shaw only a single phone call, it was a call that he was

not required to grant in any event.  Moreover, the claimed denial occurred at a time when

Shaw already had the assistance of attorney Hughes to pursue his claims of disability

discrimination.  While the court has located no case directly comparable to this one, most

retaliation cases allowed to proceed involve far more serious conduct.  *See, e.g.*, *Davis v.

Goord,* 320 F.3d 346, 353 (2d Cir. 2003) (discontinuation of medically-prescribed high-fiber

diet and delay of medical appointment could cause sufficiently adverse effects to support

retaliation claim); *Bridges*, 557 F.3d at 552 (prisoner stated claim for retaliation where he

alleged "delays in his incoming and outgoing mail; harassment by a guard kicking his cell

door, turning his cell light off and on, and opening his cell trap and slamming it shut in

order to startle him when he was sleeping; unjustified disciplinary charges; and improper

dismissal of his grievances"); *Murphy v. Lane*, 833 F.2d 106, 108-09 & n.1 (7th Cir. 1987)

(transfer of inmate to facility not properly staffed to care for his psychiatric needs); *Johnson*,

292 F. Supp. 2d at 1152 ("transfer to an institution in which a person has specific reasons

to fear for his life and safety" enough to state retaliation claim).

These serious deprivations stand in stark contrast to those that are merely unpleasant

or inconvenient, like the deprivation Shaw alleges here.  *See, e.g.*, *Morris v. Powell,* 449 F.3d

682, 687 (5th Cir. 2006) (one-week change in job classification, with one day in an

unpleasant work station, could not support retaliation claim, even though inmate "may have

experienced discomfort for a few days"); *West v. Grams*, No. 11-cv-687-slc, 2014 WL

2711959, at *5 (W.D. Wis. June 16, 2014) (practice of serving Ramadan meals as late as

22

possible did not create "sufficient objective deterrent effect"); *see also Zitzka v. Vill. of Westmont*, 743 F. Supp. 2d 887, 917 (N.D. Ill. 2010) ("trivial harms, petty slights, [and] minor annoyances" not actionable under First Amendment).   Indeed, even these minor deprivations generally involved more than a single isolated act, much less denial of a single phone call.   In light of this authority, the court is not persuaded that a one-time inconvenience based on denial of a special, discretionary privilege is enough to support a claim for retaliation.  *Cf. ACLU of Md., Inc. v. Wicomico Cnty., Md.*, 999 F.2d 780, 785 (4th Cir. 1993) ("Withdrawal of a special accommodation of an ACLU paralegal, whether or not it was done in response to filing of a lawsuit, is not sufficiently adverse to [the institutional plaintiffs] or to the ACLU to constitute retaliation.").

Nevertheless, Shaw responds that Messing's actions *are* sufficiently serious to deter a person of ordinary firmness from exercising his First Amendment rights, because they constitute a violation of his right to equal protection.[16]   As a preliminary matter, Shaw provides no legal support for the proposition that labeling an otherwise-trivial action a constitutional violation of a different sort makes it objectively serious for retaliation purposes.[17]   Additionally, Shaw's argument is essentially circular.   Indeed, his class-of-one

---

[16] Defendants' reply states that Shaw was not granted leave to proceed on a class-of-one equal protection claim.  (Dkt. #70.)  While this is true of the original screening order, the court did grant Shaw's motion for reconsideration on that point and reinstated the claim in question on May 23, 2014.   (*See* dkt. #55.)   Moreover, defendants have since answered those allegations and have notified the court of their intent to file a motion for summary judgment on the claim of equal protection.  (Dkt. #60.)

[17] Neither of the cases he cites is on point.  *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009), a Title VII case, held that intimidation, isolation where *all* employees were "equally isolated" from one another and minimal alteration in job duties were not actionable as retaliatory acts.  *Surita v. Hyde*, 665 F.3d 860, 878-79 (7th Cir. 2011), held that where a plaintiff sought to hold a rally but was informed she would be required to get a permit and pay $1500 under a never-enforced ordinance, or her future applications would be denied, those actions were enough to allow the plaintiff to proceed past summary judgment.   Both cases have at least a subtle flavor of equal protection considerations --

equal protection claim alleges that Messing treated Shaw differently than other inmates because Shaw complained about the alleged discrimination at OSCI.  At its core, this is *exactly* the same conduct he uses to state his claim for retaliation.  (*See* May 23, 2014 Opinion & Order (dkt. #55) 6 (screening Shaw's equal protection claim); Oct. 16, 2013 Opinion & Order (dkt. #15) 14 (screening Shaw's retaliation claim).)  At bottom, Shaw is effectively seeking to use the alleged retaliation itself, couched in terms of equal protection, to prove that the alleged retaliation was sufficiently serious to deter future First Amendment conduct.  Regardless, the inconsequential nature of the denial fares no better as a purported equal protection violation than an act of retaliation.  As described as an isolated event not based on any suspect classification, it appears to be no more than a *de minimis* imposition. *See Lomax v. McCaughtry*, 731 F. Supp. 1388, 1394 (E.D. Wis. 1990).

### III. First Amendment Freedom of Speech

Both parties have moved for summary judgment on Shaw's political speech claim against Jones and Loker, based on their refusal to permit his donation to the DNC.  Political expenditures are without doubt protected by the First Amendment.  *E.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 360 (2010); *Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 152-53 (7th Cir. 2011).  However, "in the prison setting, all bets are off when it comes to how and to what extend the First Amendment should be applied." *West v. Frank*, 492 F. Supp. 2d 1040, 1044 (W.D. Wis. 2007).  This is because, under the rule of *Turner v. Safley*, 482 U.S. 78, 89 (1987), "when a prison regulation impinges on

---

*Stephens* insofar as isolation was not actionable where other employees were equally isolated, and *Surita* in that the plaintiff was singled out for enforcement of the ordinance in question -- but neither deviates from the practice of looking at the context and circumstances of the *conduct itself* to determine whether it would deter an objectively reasonable person from exercising his First Amendment rights.

inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Thus, "[p]risoner claims under the First Amendment are not analyzed under the strict scrutiny review that nonprisoners' claims ordinarily receive." *Johnson v. Raemisch*, 557 F. Supp. 2d 964, 971 (W.D. Wis. 2008).

Defendants have added an additional layer of deference to this court's assessment of their actions by invoking the defense of qualified immunity. Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). While traditionally courts were required to assess first whether a constitutional violation had occurred before determining whether the right violated was clearly established, *see Saucier v. Katz*, 533 U.S. 194 (2001), courts are now permitted to analyze the second step without ruling on the actual constitutionality of the underlying conduct, *see Pearson*, 555 U.S. at 236.

Here, Shaw carries the burden to show that his First Amendment right to disburse funds to the DNC was clearly established, "either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 723-24 (7th Cir. 2013). Importantly, qualified immunity is a purely objective inquiry, making an official's "subjective" good or bad faith irrelevant. *Harlow*, 457 U.S. at 816-18; *Harrell v. Cook*, 169 F.3d 428, 431 (7th Cir. 1999).

Shaw's opposition focuses almost entirely on the right to make political donations *in general*.   Shaw argues, and the court certainly agrees, that the right to make monetary donations to political campaigns is protected by the First Amendment.  The problem is that in seeking to analogize his own situation to that general body of law, Shaw discounts *Turner* and its impact on his rights.  Cases like *Citizens United* do not deal with monetary donations to political parties *by prisoners*, and so do not take into account the fact that incarceration significantly lessens the protections of the First Amendment, as does a felony conviction more generally permit restrictions on core political activity, at least as Jones noted when it comes to the right to vote.  That context is important, and it renders Shaw's attempt to treat the *Citizens United* decision as clearly establishing an inmate's right to contribute to political campaigns unpersuasive.

Unfortunately for Shaw, he can point to *no* case factually analogous to this one, nor has the court been able to locate one.[18]  Thus, Shaw cannot demonstrate that defendants' conduct was "so egregious and unreasonable" that they could not possibly have believed their behavior lawful.  *Abbott*, 705 F.3d at 723-24.  He has not met this burden.

Moreover, courts have repeatedly held, albeit in contexts different from this one, that prisons and prison officials have significant discretion in handling prisoner property, including money.  *See, e.g., Blankenship v. Gunter,* 898 F.2d 625, 627-28 (8th Cir. 1990)

---

[18]  Defendants cite a number of cases in which courts have upheld prison restrictions on disbursements, but none of those is particularly similar to the present situation either.  *Abdullah v. Gunter*, 949 F.2d 1032 (8th Cir. 1991), arguably the most closely analogous case, did not broadly hold, as defendants suggest, that prison officials' denial of inmate's request to donate $2 to a religious organization did not violate the inmate's "constitutional rights" in general.   Rather, although the Eighth Circuit concluded that summary judgment was appropriate on theories of equal protection and due process, it actually *remanded* for a new trial on the plaintiff's First Amendment claim, finding that the district court should have appointed counsel to assist the inmate bringing the claim.  Of course, that the court decided to remand, rather than reverse, arguably suggests that the right to contribute is not *clearly* established.

(First Amendment free exercise; upholding inmate's denial of request to donate to church pastor under *Turner*); *VanDyke v. Sw. Va. Reg'l Jail Auth.*, No. CIVA 7:06CV00267, 2006 WL 2475898, at *3 (W.D. Va. Aug. 25, 2006) (First Amendment free exercise; upholding prison's refusal to allow inmate to donate money to church under *Turner*); *Sahagian v. Dickey*, 646 F. Supp. 1502, 1508 (W.D. Wis. 1986) (Fourteenth Amendment due process; denying inmate leave to proceed on claim challenging restrictions on sending money out of prison); *Richards v. Cullen*, 150 Wis. 2d 935, 939-41, 442 N.W.2d 574 (Ct. App. 1989) (Fourteenth Amendment due process; upholding prison policy to deduct 15% of all income for establishing a release account).

In light of this case law and the high level of deference courts owe to prison officials' decisions under the doctrine of good faith immunity, *George v. Smith,* 467 F. Supp. 2d 906, 919 (W.D. Wis. 2006), a reasonable corrections officer could have concluded that his exercise of discretion was lawful -- in order to further Shaw's rehabilitation, for example, by ensuring he had money available for his future release.  Since neither Jones nor Loker is now in a position to permit Shaw to make the donation -- Jones having transferred and Loker having retired – they also cannot be liable for injunctive relief and so are entitled to summary judgment on Shaw's First Amendment claim.[19]

## ORDER

IT IS ORDERED that:

1) plaintiff Terrance Shaw's motion for partial summary judgment and preliminary injunction (dkt. #31) is DENIED; and

---

[19] Again, this is not to say that defendants' actions *were*, in fact, lawful, nor even that it does not violate Shaw's First Amendment rights.

2) defendants' cross-motion for summary judgment (dkt. #42) is GRANTED IN PART and DENIED IN PART, consistent with the opinion above.

Entered this 30th day of September, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

28